11-CV-00311-CMP

FILED
ENTERED
RECEIVED

2011   LK

...ates District Court,
Western District of Washington

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

Lance P. McDermott
     Plaintiff,

    vs.

Patrick R. Donahue, Postmaster
General, United States Postal
Service, *Et All*,

     Defendants.

) Case No.: **C11-0311** MJP

)

) Civil Service Reform Act of
) 1978,

)

) Noted for consideration on 11
) March 2011.

)

## Declaration

   This Complaint is filed due to the Constitutional, Statutory and Administrative violations of Due Process inflicted on Other U.S. Postal Service (USPS) Employees and Myself by Officials of the Agency and Officials of the USPS Inspection Service acting under the color of their Law Enforcement Authority. Federal Law Enforcement Officials are rushing to depriving the rights of Employees under compulsion to submit to an Agency Administrative Investigation under the Color of Law (18 U.S.C. 242) in conspiracy with other USPS Officials (18 U.S.C. 241).

   Therefore, I am rushed to file this Complaint and ask for a Temporary Restraining Order. Given time I intend to amend this Complaint and allow other Employees injured to join.

   I also ask the Court to consider granting FRCP 23 Class Action with proper Legal Defense (Hagens, Berman, Sobol and Shapiro LLP) to the 50,031 Employees (GAO Report 10-178, exhibit

1  1, page 1) being denied their Constitutional and Statutory Due

2  Process Rights under the USPS National Reassessment Program.

3

4                  Jurisdiction over the Person

5  *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388

6  (1971) the Court held that a federal agent acting under color of

7  his authority gives rise to a cause of action for damages

8  consequent upon his unconstitutional conduct. (Bell v. Hood, 327

9  U.S. 678 (1946))  The Court further found that – "it is ... well

10 settled that, legal rights have been invaded, and federal statute

11 provides for a general right to sue for such invasion, Federal

12 courts may use any available remedy to make good the wrong done."

13

14                  Subject Matter Jurisdiction

15     I am asserting my claim created by federal law pursuant to 28

16 U.S.C.A. Section 1331 that there are Federal Questions to be

17 answered by the Federal Court.

18

19                  Jurisdiction to Render Judgment

20     Title 42 section 1983 "… or causes to be subjected, any

21 citizen of the United States or other person within the

22 jurisdiction thereof to the deprivation of any rights,

23 privileges, or immunities secured by the Constitution and laws,

24 shall be liable to the party injured in an action at law…"

25 Equitable and other relief is sought pursuant to 42 U.S.C.

1  Section 2000e-5(g).

2

3                    Scope of Jurisdiction

4      The scope of the Court's jurisdiction is within the

5  Constitution Article 14 Due Process Procedures and Congressional

6  Statutes named in this pleading.

7

8                         Standing

9

10     Title 28 rule 15(a)(1), - "... The uniform rule (see General

   Note above) requires that the petition for review contain **'a**

11 **concise statement, in barest outline,' ..."**

12

13                          Injury

14     I believe that Other Employees and I have been injured by

15 constitutional, statutory and administrative due process

16 procedural violations.

17

18                        Background

19

20     On February 8, 2011, at about 1:30pm I was told by my

21 maintenance supervisor Ken Dow that maintenance employee Brenda

22 Burk asked for me as an American Postal Workers Union (APWU)

23 maintenance steward to be present for a meeting.  The meeting was

24 conducted by Christian Bartero from Human Resource over the

25 speaker phone. Ken Dow read several documents reportedly created

1   under National Reassignment Program (NRP) for Limited and Light
2   Duty employees by the Seattle NRP District Committee.   Ken left
3   the room several times to make copies for Brenda of what he was
4   "required" to read to her.   Basically Brenda was told that the
5   "Committee" found that there was no light duty work for her and
6   that she would be given 30 days of Administrative Leave and than
7   discharged to the Department of Labor's Occupational Workers
8   Compensation Program (OWCP).   Brenda asked who made the decision
9   and was told that the "Committee" made the decision.   Brenda
10  asked why she was not notified or given an opportunity to be
11  heard and was told that "they followed all the rules".   She was
12  told that the Committee reviewed everything including her Medical
13  Records (protected by the Privacy Act).   Brenda was told that she
14  only had the right to appeal to a Human Resource Manager but was
15  not given anyway to contact that Manager.   She was not even given
16  a written decision signed by the Manager with Authority to fire
17  her containing the details of why she was being let go after 14
18  years with the Postal Service.   Brenda is a disabled veteran who
19  was injured on the job two years ago and was denied medical
20  treatment by the Postal Service which further injured her
21  requiring her to use a walker.   Despite her disability she was
22  performing her maintenance job until Management said that she
23  could not go out on to the workroom floor with her walker. She
24  since had been working in the office answering phones and working
25  with our parts clerks inventorying and stocking parts.   When she

1  asked why she could not continue doing this work Christian
2  Bartero said that it would be a "wind-fall" for Brenda to let her
3  continue.  I asked about the National In-Sourcing Program
4  (exhibit 4) started in 2006 to use limited and light duty
5  employees to answer phones that saved the Postal Service $83
6  million from the Call Center Contract in 2006.  Christian said
7  that she did not know of the program.  At the end of the meeting
8  Brenda was almost in tears and said - "I understand now what
9  makes employees go postal."  I said - "Don't go there Brenda
10  these people don't care."  Brenda spoke a little more about how
11  unfair it was that she was never informed and was not allowed to
12  participate in the decision.

13      On February 11, 2011, at about 10am I was at work and Postal
14  Inspector Michael Vanachek told me that he want to interview me
15  about Brenda's meeting. I told the Inspector that I did not trust
16  Inspectors because they work for management.  The Inspector told
17  me that he did not work for management.  I asked him for his
18  business card and he told me that he had his home phone number on
19  it and did not like people calling him at home so he would not
20  give me one (I do not know if I spelled his name right).  He told
21  me that he was just there to get a statement from me and that I
22  was not in trouble. He also told me that it I told him anything
23  criminal that he would have to report it.  I talked to the
24  Inspector about all the Due Process rights that Management
25  violated and asked if he would look into the violations.  He said

1  that he was only looking at Brenda's threats to Management.  I
2  spoke to him about possible criminal acts of Management and he
3  said that he was only interest in Brenda.  I gave him a written
4  statement about the meeting as describe above and he used his Law
5  Enforcement Authority to swear me to the truth of it.  I did not
6  see his badge.

7       On February 14, 2011, at about 10am Brenda called me on my
8  cell phone and asked if I would represent her as a maintenance
9  steward in an investigation at 10am on February 15, 2011.  I told
10 her I would be there.  At about 6pm I was called on my cell phone
11 at home while eating dinner by my supervisor Ken Dow.  Ken –
12 "This is Ken, since you are part of the investigation you cannot
13 represent Brenda tomorrow ..." I hung up and he called back
14 several times using different phones.  I believe that it was an
15 invasion of my privacy since I had never given him my cell phone
16 number and he can only call me on my home number if it is a
17 postal emergency.

18      On February 15, 2011, at about 10am before the investigation
19 meeting with Brenda started Inspector Vanacheck told me that I
20 could not represent Brenda and the "rule" was that management
21 would choose.  I told him that he had the rule wrong.  He told me
22 – "You have nothing to do with this" and – "get out of hear".
23 The Inspector walked over to Supervisor Donna Gruetzmacher and
24 asked her for another union steward.  Donna talked to clerk
25 steward Chuck Lee (exhibit 2) with the Inspector.  The Inspector

1   with Chuck present handed Donna a business card and told her to
2   call if she had any problems.  Chuck asked him for a business
3   card twice and the Inspector would not give him one. The
4   Inspector than brought Chuck over to Brenda and she again stated
5   that it was her choice and Chuck agreed.  The Inspector then said
6   that he would call a Manager and get another maintenance steward
7   to represent Brenda.  After an hour and a call to the American
8   Postal Workers Union (APWU) President Jessie Gobunquin I was
9   allowed to represent Brenda in the meeting that started about
10  11:15am with a second Inspector John Wagner present.  Brenda
11  asked what the investigation was about.  Inspector Vanachek asked
12  me if I had told Brenda what it was about.  I told him that it
13  was not my job to inform Brenda what they were investigating.  I
14  asked the Inspector if he was doing a Civil or Criminal
15  investigation. After some arm twisting Inspector Vanachek said
16  that they were doing an "administrative" investigation.  I ask
17  what administrative rule Brenda was accused of violating and he
18  said "making threats".  I again asked him what specific rule did
19  she violate and he told us that he was not going to argue with
20  me.  He than again stated that it was an administrative
21  investigation and that anything said in a criminal nature would
22  be prosecuted. The Inspector said that they had been called in by
23  a Manager.  Brenda asked which Manager called them and they would
24  not say.  Brenda said that appeared that they were working for
25  Management who had already violated her rights.  Inspector John

1   Wagner said that they had no vested interest in the outcome and
2   they did not even care one way or another.  Inspector Vanachek,
3   who seemed to be in charge, asked if we needed a break before
4   starting the interview. I said yes and Brenda and I left the
5   room.   I told Brenda that the Inspectors were abusing their Law
6   Enforcement Authority to conduct an administrative investigation
7   and not to take part until she can get an attorney.  She decided
8   to go on with the investigation. Inspector Vanachek said that he
9   had reviewed everything including Brenda's Medical Record.
10  (Note:  Medical Records can only be released to Law Enforcement
11  Officials doing a criminal investigation.)  Brenda told her side,
12  as I already stated.  Inspector Vanachek then asked her if she
13  had said anything about using a gun or the murder of Postal
14  Manager Ray Ubis.  Both Brenda and I said that she did not make
15  any of these statements.  The Inspector asked Brenda about
16  hitting her walker on her car (crime?) when she was escorted out
17  of the building by Ken Dow (I was not present).  Brenda said that
18  she tripped on the curb (no handicap access).  When I said that I
19  thought that it was an abuse of their law enforcement authority
20  (exhibit 3) to continue the investigation Inspector Wagner said
21  "the meeting is over".  Then Inspector Vanachek said that they
22  would turn over their findings to Management and "they" would
23  make a decision.

24     Brenda called me on February 19, 2011, and told me that Ken
25  Dow had called her at home and told her to come in for another

1  Inspection Service investigation interview on February 23, 2011,
2  at 10am.  She also said that Ken had said that he had let me know
3  of the meeting.  I said that Ken had not talked to me and I would
4  be there for the meeting and that she should try and get her
5  attorney to attend.

6      On February 21, 2011, at 1:30pm at work Ken Dow asked me if I
7  knew of the Meeting.  I said yes.  He than said - "Just tell
8  Brenda to answer the questions".

9      Therefore, on February 22, 2011, I filed this Complaint in
10 hast and request a FRCP 65(b) Temporary Restraining Order to stop
11 this unconstitutional and unlawful behavior.

12
13                          Arguments
14     1.   Constitutional Due Process -
15     *FTC v. Standard Oil Co. of California*, 449 U.S. 232, (1980)
16 Notes, - "… Courts are therefore **obliged** to raise finality
17 concerns even when the parties do not.  In principle, courts must
18 also resolve finality issues before addressing nonjurisdictional
19 timing doctrines such as common law exhaustion or ripeness, See
20 *American Train Dispatchers Ass'n v. ICC*, 949 F.2d 413 (D.C. Cir.
21 1991).  ('At the threshold, the ICC argues that the Union's
22 petition is barred for want of finality, ripeness, and exhaustion
23 of administrative remedies.  Of these three requirements for
24 review, only finality is jurisdictional, and so we are bound to
25 consider it first.'), though courts do not always pay attention

1   to such niceties."  (WEST Group, American Casebook Series,

2   Federal Administrative Law, 2nd Edition, 2001, (WEST) pages 859-

3   860.)

4        In *Little v. Barreme*, 6 U.S.(2 Cranch) 170, 2 L.Ed. 243

5   (1804), (WEST page 738), the Court established that as long as a

6   person does not seek monetary relief there is no longer a barrier

7   for judicial review because plaintiffs are often interested in

8   preventing certain kinds of agency actions.  In *Marbury v.*

9   *Madison* (1803) the Supreme Court commanded judges to abide by

10  constitutional norms.  In *Bowen v. USPS*, (1983) 459 U.S. 213(b) —

11  "Of paramount importance is the right of the employee, who has

12  been injured..."  In *Lujan v. Defenders of Wildlife*, 504 U.S.

13  555, (1992), (WEST page 787), the Court found that respondents

14  had standing for an additional reason:  because they suffered a

15  **'procedural injury'** and the citizen-suit provision creates a

16  'procedural right' to consultation in all 'persons'.

17       In a writ for USPS v. Gregory, No. 00-758, (2000), USPS

18  argued that Civil Service Reform Act of 1978 (5 U.S.C. 7513(a))

19  confirmed a Postal Employee's right to four specific procedural

20  protections:  (1) Advance notice; (2) Time to respond; (3)

21  Counsel;  and (4) a written Decision providing specific reasons

22  for the agency's actions.  (5 U.S.C. 7513(b) and (c)) — "Thus, on

23  the one hand, the Reform Act strives to enable government

24  managers to more effectively hire, and otherwise discipline their

25  employees, while at the same time according employees their

1   requisite procedural protections.  *LaChance v. Devall*, 178 F.3d
2   1246, 1254 (Fed. Cir. 1999)."

3       GAO Report 10-78, December 2009, The Program for Reassessing
4   Work provided to Injured Employees Is Under Way, but Actions Are
5   Needed to Improve Program Management (exhibit 1).  Page 13, Phase
6   2, - Employee who have reached their Medical Maximum Improvement,
7   - "Meet with the employee and, when requested, the employee's
8   union representative to discuss their job offer..."  Page 43,
9   #10, - "Notify employees by letter at least 14 days in advance of
10  employee interviews."

11      USPS Handbook EL-505, page 16, - "Any employee or supervisor
12  responsible for making reports in connection with an injury who
13  willfully fails, neglects, or refuses to do so; induces, compels,
14  or directs an injured employee to forego filling a claim; or
15  willfully retains any notice, report, or paper required in
16  connection with an injury may be subject to a fine of not more
17  than $500 or 1 year in prison, or both.  (20 CFR 10.23)."

18      20 CFR 10.126, - "The decision shall contain findings of fact
19  and a statement of reasons."  10.118, - "The employer is
20  responsible for submitting to OWCP all relevant and probative
21  factual and medical evidence in its possession, or which it may
22  acquire through investigation or other means."

23      USPS Handbook EL-307, Reasonable Accommodation, An
24  Interactive Process, 223.1, - "Gaining the individual's
25  participation is a key part of the process - that's what makes it

1   interactive..."  25, – "If you deny an individual's request for
2   accommodation, you must notify the individual in writing of the
3   denial as soon as possible.  The denial must:  – Be given in
4   writing and in plain, specific language.  – Give the reasons for
5   denial.  – Identify the individual or office that made the
6   decision.  – Provide the following:  -- Notification of the
7   individual's right to file an equal employment opportunity (EEO)
8   complaint.  – Notification of any other appeal rights to which
9   the individual may be entitled.  – Description of procedures
10  available for informal dispute resolution.  Make this
11  determination only after you have made an individualized
12  assessment of the situation and the individual in question and
13  consulted with you Reasonable Accommodations Committee and Area
14  law office."

15      In *Daniels v. Williams*, 474 U.S. 327, 337, (1986), (WEST page
16  357) the Court found that the Due Process Clause of the
17  Fourteenth Amendment is the source of three different kinds of
18  constitutional protections.  In *Cleveland Board of Education v.*
19  *Loudermill* (1985) the Court said that the minimum process due is
20  determined as a matter of federal constitutional law.  In *Wester*
21  *v. Doe*, 486 U.S. 592, (1988), (WEST page 769) the Court's warned
22  that judicial review of all 'colorable constitutional claims'
23  arising out of the respondent's dismissal may well be
24  constitutional required.

25      In *Connecticut Light and Power v. NRC*, D.C. Cir. 673 F.2d 525

1   (1982), (WEST page 266), the Circuit Court found that and agency

2   commits a '**serious procedural error**" when it fail to reveal

3   information to allow "meaningful commentary". – "...These

4   requirements, which serve important purposes of agency

5   accountability and reasoned decision-making, impose a significant

6   duty on the agency." (See *Home Box Office Inc. v. FCC*, 567 F.2d

7   9, 55, (D.C. Cir. 1977) and *Greater Boston Television Corp. v.*

8   *FCC*, 444 F2d. 841, 851, (D.C. Cir. 1970).)

9     *National Credit Union Administration v. First National Bank &*

10   *Trust*, 522 U.S. 479, (1998) (WEST page 832) – " *** Our decision

11   in *Air Courier* likewise, cannot be squared with the Court's

12   decision in this action ***. The **postal employees** would have

13   established standing under the Court's analysis in this

14   action..."

15   U.S. EEO Commission, – "The Commission's federal sector case

16   precedent has long defined an 'aggrieved employee' as one who

17   suffers a present harm or loss with respect to a **term, condition,**

18   **or privilege** of employment for which there is a remedy."

19

20     2. Deprivation of Rights Under the Color of Law –

21     Title 39 Section 233.1(b(1)(i) – "The Office of Inspector

22   General will investigate all allegations of violations of postal

23   laws or misconduct by postal employees ..." (ii) – "The

24   Inspection Service will investigate all allegations of violations

25   of postal laws or misconduct by all other persons."

1      NLRB Case 13-CA-16195-P, 10 March 1979, - "...The
2  Administrative Law Judge found that Respondent violated Section
3  8(a) of the Act (National Labor Relations Act) by requiring
4  employee Eddie L. Jenkins to submit to an interview with Postal
5  Service inspectors, which the employee reasonably feared might
6  result in disciplinary action..."  THE REMEDY:  - "Having found
7  that the Postal Service has violated the NLRA in certain
8  respects, I shall recommend that it be required to cease and
9  desist there-from and from like of related conduct and to post
10 appropriate notices."

11     USPS Publication 108, Threat Assessment Team Guide, 1-2, -
12 "... Each district must establish and maintain a Treat Assessment
13 Team."  4-4 Incident Response, 1, - "The Human Resources Manager
14 makes an initial assessment of the risk level and determines
15 whether the Treat Assessment Team needs to intervene."

16     USPS Administrative Support Manual (ASM) 211.12 (exhibit 2),
17 - "The Postal Inspection Service, a federal law enforcement
18 agency, conducts audits and investigations of Postal Service
19 programs and operations (18 U.S.C. 3061 and 39 U.S.C. 404(a)(7)),
20 and is headed by the chief inspector, who reports directly to the
21 postmaster general."   Exhibit 211, page 16, Designation of
22 Functions does not list "administrative" investigations.

23     In *Lybarger v. City of Los Angles,* 40 Cal. 3d 822 (1985)the
24 Court found that the employee must be told -(1) his silence could
25 be deemed insubordination, leading to administrative discipline,

1   and -(2) any statement made under the compulsion of the threat of
2   such discipline (i.e. incriminating statements) could not be used
3   against him in any subsequent criminal proceedings. (Also see
4   *Spielbauer* and *Cleveland Board of Education v. Loudermill*
5   (1985).)

6

7       3.  Class Action -
8       GAO Report 10-78, December 2009 (exhibit 1) on page 41 shows
9   50,031 employees affected by the National Reassessment Program
10  out of 748,307 (6.68%).  However, among Headquarters employees it
11  shows of 11,370 management employees 70 are affected (0.62%).
12  This clearly shows that the Program discriminates between
13  management and labor employees.
14      The USPS five year Operating Statistics shows an increase of
15  +63% headquarters positions between 2002 and 2006.
16      USPS Memorandum, 1 October 2007, (exhibit 5), - "Failure to
17  afford an employee or applicant (qualified disabled) appropriate
18  accommodations when necessary and/or requested, can lead to
19  costly lawsuits."

20

21                          STANDARD OF REVIEW

22      The US Court of Appeals for the Ninth Circuit in *Flamingo*
23  *Industries v. USPS* No. 01-15963, the Court stated "In 1996,
24  Congress amended 28 USC section 1491, part of the codification of
25  the Tucker Act, by enacting the Administrative Dispute Resolution

1  Act of 1996 (ADRA), Pub. L. 104-320, 110 Stat. 3870 (1996)."
2  Footnote 5 - "... 28 USC section 1491(b)(4) imports Administrative
3  Procedures Act (APA) standards of review... 28 USC 1491(b)(4)
4  incorporates by reference the APA review standards into cases..."

5      Title 5 section 504 Congressional Findings:  Section 202 of
6  title II of Public Law 96-481 provided that: - "(a) The Congress
7  finds that certain individuals, partnerships, corporations, and
8  labor and other organizations may be deterred from seeking review
9  of, or defending against, unreasonable governmental action
10  because of the expense involved in securing the vindication of
11  their rights in civil actions and in administrative proceedings."

12      Title 5 section 557 (d)(1)(A)(12) - "... violated shall be
13  determined from the perspective of a reasonable person with
14  knowledge of the relevant facts."

15      Title 5 section 702 - "A person suffering wrong because of
16  agency action, or adversely affected or aggrieved by agency
17  action within the meaning of a relevant statute, is entitled to
18  judicial review thereof."

19      United States Constitution Amendment XIV Section 1. - "All
20  persons born or naturalized in the United States, and subject to
21  the jurisdiction thereof, are citizens of the United States and
22  of the state wherein they reside. No state shall make or enforce
23  any law which shall abridge the privileges or immunities of
24  citizens of the United States; nor shall any state deprive any
25  person of life, liberty, or property, **without due process of law;**

1  nor deny to any person within its jurisdiction the equal
2  protection of the laws."

3      In *City of Monterey v. Del Monte Dunes* a 1999 case the
4  Supreme Court confirmed that 42 U.S.C. 1983 granted plaintiffs
5  the right to sue for violations of due process.

6      Title 42 section 2000(e) "Nothing contained in this Act shall
7  relieve any government agency or official of its or his primary
8  responsibility to assure nondiscrimination in employment as
9  required by the Constitution and statutes or of its or his
10  responsibilities under Federal Order 11478 relating to equal
11  employment opportunity in the Federal Government."

12      Title 39 section 1001 - (b) "… The Postal Service shall
13  establish procedures, in accordance with this title, to assure
14  its officers and employees meaningful opportunities for promotion
15  and career development and to assure its officers and employees
16  full protection of their employment rights…"

17      Title 39 section 409 - (a)(B)"...shall not be immune under
18  any other doctrine of sovereign immunity from suit in Federal
19  court by any person for any violation of any of those provisions
20  of law by an officer of employee of the Postal Service

21      Title 29 section 401 Congressional declaration of findings,
22  purposes and policy - "… (b) protection of rights of employees
23  and the public; "The Congress further finds, from recent
24  investigations in the labor and management fields, that there
25  have been a number of instances of breach of trust, corruption,

1   disregard of the rights of individual employees, and other
2   failures of observe high standards of responsibility and ethical
3   conduct which require further and supplementary legislation that
4   will afford necessary protection of the rights and interests of
5   employees and the public…"

6       Civil Procedures, A Modern Approach, 2nd Addition, Chapter I
7   Choosing a System of Procedure, - "... Established procedures lie
8   at the heart of due process and as important to the attainment of
9   ultimate justice as the factual merits of a case..."

10      The Court found in *Flamingo Industries v. USPS*, D.C. No. CV-
11  00-02484-MMC, page 12504 B (6) "Having determined that Congress
12  has waived the Postal Service's immunity, we turn to the second
13  inquiry, 'whether the source of substantive law upon which the
14  claimant relies provides an avenue for relief'.  *Meyer*, 510 U.S.
15  at 484."  Page 12506 (7) "The Postal Service's sue-and-be-sued
16  waiver of immunity has created a presumption that the cloak of
17  sovereignty has been withdrawn and the Postal Service should be
18  treated as a private corporation.  See *Franchise Tax Board,* 467
19  U.S. at 520."  Page 12508 (8)  "We hold that the Postal Service
20  can be sued under federal antitrust laws because Congress has
21  striped the Postal Service of its sovereign status by launching
22  it into the commercial world as a sue-and-be-sued entity akin to
23  a private corporation…  'conduct-based' immunity can apply…
24  Accordingly, our holding that the Postal Service does not enjoy
25  status-based immunity …"

1

2

## Additional Considerations:

3

4   Civil Resource Manual Chapter 36, Effect of Declaratory
5   Judgment Act, - "… Another barrier to judicial review of
6   administrative action was removed by section 2 of Public Law No.
7   94-574, which amended 28 U.S.C. section 1331(a) … This provision
8   persuaded the Supreme Court to conclude that, subject to
9   preclusion-of-review statutes, jurisdiction to review agency
10  action is conferred by 28 U.S.C. section 1331 … Similarly, the
11  Declaratory Judgment Act, 28 U.S.C. section 2201, is not an
12  independent source of federal jurisdiction.  The purpose of the
13  Act is merely to provide an **additional remedy**, once jurisdiction
14  is found to exist on another ground ..."

15      Federal Practice Manual for Legal Aid Attorneys, Chapter 9.3
16  Declaratory Judgment Act, - "The Declaratory Judgment Act offers
17  a unique mechanism by which advocates may seek to **remedy** ongoing
18  violations of statutory or constitutional law..."  (See Tucker
19  Act)

20      *Harlow v. Fitzgerald*, 457 U.S. 800, 813-19, (1982), - "…
21  After all, courts will generally decide only whether the
22  defendant violated 'clearly established' law; this frequently
23  will require or entail determination of whether the agency action
24  in question **was or was not unlawful...**"  (WEST page 742)
25      *Association of Data Processing Service Organizations, Inc. v.*

1  *BOG of the Federal Reserve System*, D.C. Cir. 745 F.2d 677 (1984),
2  - "… the court shall hold unlawful and set aside such rule if the
3  court finds that the rule is not supported by substantial
4  evidence in the rulemaking record… **taken as a whole**."   (WEST page
5  538) (See *Nebbia v. New York,* 291 U.S. at 536(1934))

6      *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, (1967) (WEST
7  page 868) – "…  Experience dictates, on the contrary, that it can
8  hardly be hoped that some federal judge somewhere will not be
9  moved as the Court is here, by the **cries of anguish and distress**
10 of those regulated, to grant a disruptive injunction."

11

                              Scope of Review
12

13     *Flamingo Industries LTD v. USPS*, No. 01-15963, 23 August
14 2002, B – "...28 U.S.C. 1491(b)(4) provides that such decisions
15 may only be invalidated by a federal court applying the
16 deferential APA standard of review codified at **5 U.S.C. 706**."
17     In *Professional and Patients For Customized Care v. Shalala*,
18 56 F.3d 73 (1st Cir. 1993) (WEST page 296), the U.S. Court of
19 Appeals found that the **'legal effects test'** will show if the rule
20 as issued either operates as a binding norm or it does not.   At
21 444 F.2d at 851-52, (WEST page 672), – "This conception of
22 judicial review is sometimes call the **'hard look doctrine'**
23 because of its focus on insuring that agencies have looked
24 carefully and thoughtfully at the problems under consideration.
25 By the early 1970's, this process-oriented review had become a

1  settled part of administrative law, and it remains a bedrock of
2  the modern system of federal judicial review ..."

3

4      Therefore with a cry of anguish and distress I asked the
5  Court to conduct a legal effects test and a hard look *De Nova*
6  review of:  (1) USPS National Reassessment Program.  (2)   USPS
7  Inspection Services use of their Federal Law Enforcement
8  Authority to conduct Administrative Investigations for
9  Management.

10                              REMEDIES

11     1.   Pursuant to the Tucker Act I ask the Court to issue a
12  Declaratory Judgment as to weather the U.S. Postal Service
13  Inspection Service Officials using their Federal Law Enforcement
14  Authority to conduct Administrative Investigations for Management
15  is Lawful or Unlawful.

16     2.   Pursuant to the Tucker Act I ask the Court to issue a
17  Declaratory Judgment as to weather the U.S. Postal Service
18  National Reassessment Program is Lawful or Unlawful.

19     3.   If the Court finds injury to my protected Employment
20  Civil Rights to issue appropriate monetary penalty and that the
21  USPS pay my legal fees.

22     Dated this 22 day of February, 2011,

23  Lance McDermott
24  1819 So 104 ST
    Seattle, WA  98168
25  206 763-6268

Exhibits:

1 – GAO Report 10-78, December 2009, The Program for Reassessing Work Provided to Injured
Employees Is Under Way, but Actions Are Needed to Improve Program Management,.
2 – Statement of APWU Clerk Steward Chuck Lee, 22 February 2011
3 – USPS Administrative Support Manual (ASM) Chapter 2 Audits and Investigations
4 – USPS Call Center In-sourcing Program, 7 March 2007
5 – USPS Reasonable Accommodation Policy Statement, 1 October 2007

December 2009

# ≛ G A O
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-10-78, a report to
congressional requesters

# U.S. POSTAL SERVICE

## The Program for Reassessing Work Provided to Injured Employees Is Under Way, but Actions Are Needed to Improve Program Management

## Why GAO Did This Study

Between 50,000 and 60,000 United States Postal Service (Service) employees, or 7 to 8 percent of the Service's workforce, occupied a modified work assignment during fiscal year 2008. The Service must provide these assignments to employees with workplace injuries if work is available to perform within their medical restrictions. Historically, the Service has returned employees to work as soon as possible, partly to reduce its costs for workers' compensation. In 2006, the Service initiated a program, the National Reassessment Process, to ensure that modified work assignments are medically suitable and necessary to carry out the Service's mission. This requested report addresses (1) the goal of the program, (2) how it is being implemented, and (3) the program's status and outcomes. To perform its work, GAO analyzed data and documentation, visited four districts selected to illustrate a range of conditions, and interviewed Service officials.

## What GAO Recommends

GAO recommends that the Service establish program completion timelines, track and measure outcomes, and disclose limitations of its reported cost savings. The Service agreed with GAO's third recommendation and disagreed with the other two. While GAO modified one recommendation in response to the Service's comments, GAO retained all three to encourage program completion, accountability, and transparency.

View GAO-10-78 or key components.
For more information, contact contact Phillip
Herr, (202) 512-2834, or Herrp@gao.gov.

## What GAO Found

The goal of the National Reassessment Process is to ensure that all employees in modified work assignments are performing work that is both suitable to their medical restrictions and necessary to the Service's mission. Among other things, the program aims to eliminate what Service officials call "make–work" assignments which, over time, occurred when factors such as increasing automation and declining mail volumes reduced the amount of manual, sedentary, and useful work available for these employees to perform. The number of employees reassessed under the program is not readily available nationwide because the Service does not aggregate district data. However, on September 30, 2008, there were 31,044 employees in modified work assignments, all of whom may have been reassessed under the program.

The program is being implemented in three phases in the Service's 74 districts. In Phase 1, the Service ensures that all employee medical records are current, and categorizes the employees based on their medical status. In Phases 2 and 3, the Service attempts to find each employee medically suitable and necessary work. If successful, the Service provides these employees with modified work assignments. However, when suitable work is not available, employees become eligible for wage loss compensation (workers' compensation). Specifically, because employees in Phase 2 have reached their maximum medical improvement, they are not expected to return to work for the Service and, thus, may receive workers' compensation indefinitely, whereas Phase 3 employees are eligible for workers' compensation for only the number of hours they cannot work for the Service. Initially, the Service implemented each phase of the program sequentially; however, in July 2009, it began allowing some districts to conduct Phases 2 and 3 concurrently to expedite the program's completion. The Service has not established milestones for completing the program, but, according to Service officials, they expect the program to be fully implemented by September 30, 2010.

After 3 years, none of the Service's districts had completely implemented the program, and implementation in most is far from complete. Available data on employee outcomes are limited and preliminary because implementation is ongoing, and the Service does not track employees who receive medically suitable and necessary work—the goal of the program. The Service achieves program cost savings when, for example, employees return to full duty, retire, resign, or perform modified work assignments. However, when suitable work is not available, some employee outcomes could increase the Service's short- and long-term costs for workers' compensation. For the year ending June 30, 2009, workers' compensation costs totaled about $1.1 billion and, in 2008, the Service estimated that its future liability for these costs totaled about $8 billion. The Service reported to the Congress that the program saved $146 million in fiscal year 2008. However, the Service did not disclose that these reported savings reflect neither the Service's total gross savings nor its net savings, nor any other limitations in its cost estimation methodology.

| -1

**Figure 2: Key NRP Activities, Stages, and Possible Employee Outcomes, by Phase**

| Phase 1 – All employees with workplace injuries | Phase 2 – Employees who have reached their MMI | Phase 3 – Employees who have reached their MMI |
|---|---|---|
| **Stages in phase: None** | **Stages in phase:** <br> -Job search (9 steps) <br> -Job offer (6 steps) <br> -No work available (NWA) (15 steps) | **Stages in phase:** <br> -Implementation (6 steps) <br> -Job offer (4 steps)[e] <br> -New medical documentation/new injury (3 steps) |
| 13 steps | 30 steps | 13 steps |
| **Key activities:** <br><br> -Identify all employees with workplace injuries who are in (or capable of working in) modified work assignments. <br><br> -Ensure that employee information, including medical documentation of the employee's work restrictions, is up to date and, where necessary, request updated documentation. <br><br> -Ensure that all employees are properly classified according to whether they have, or have not, reached their MMI. <br><br> -Validate that all records have been updated and that employees have been properly sorted according to their physician's determination of each employee's MMI status (done by headquarters officials). <br><br> **Possible employee outcomes:** <br><br> Employee may: <br><br> -Return to full duty if the employee's medical documentation indicates, for example, that he or she has fully recovered from his or her injury. | **Key activities:** <br><br> -Identify all necessary work available within the district.[a,b] <br><br> -Assess whether the available work can be accomplished within an employee's medical restrictions. <br><br> -Where medically suitable work is available, prepare a job offer for each employee. (This may be either a new job offer, or a job reflecting the employee's prior modified assignment.) <br><br> -When no medically suitable work is available, develop a preliminary list of employees with NWA determinations for review and approval by district management, and double check each of these employees' files for accuracy to ensure, for example, that job searches for each employee were performed correctly. <br><br> -Approve preliminary NWA list and meet with unions to discuss the list. <br><br> -Notify affected employees of the Service's NWA determination. <br><br> -Meet with employee and, when requested, the employee's union representative to discuss the job offer and provide the employee with an opportunity to update his or her medical records.[c] <br><br> **Possible employee outcomes:** <br><br> Employee may: <br><br> -Be placed in a modified work assignment (i.e., either the same medically suitable and necessary work assignment that he or she performed before the NRP or a new medically suitable and necessary work assignment); <br><br> -Return to full duty; <br><br> -Retire or resign from the Service; or <br><br> -Receive an NWA determination—(i.e., the Service was unable to find a necessary and medically suitable work assignment for the employee). | **Key activities:** <br><br> -Identify all available necessary work (from work conducted during Phase 2).[a] <br><br> -Update records to ensure that all employees who have not reached their MMI are listed and that all employees' files are complete and still up to date. <br><br> -Conduct job searches within the Service for employees and hold work status meetings with employees to discuss possible work assignments.[d] <br><br> -Assess employees with new medical documentation or a new injury to determine whether medically suitable and necessary work is available for these employees. <br><br> **Possible employee outcomes:** <br><br> Employee may: <br><br> -Return to full duty, or <br><br> -Retire or resign from the Service. <br><br> The remaining employees receive one of three possible work determinations; <br><br> -a "full day work" determination—(i.e., the number of hours of medically suitable and necessary work identified by the Service matches the number of hours the employee is allowed to work by his or her physician); <br><br> -a "partial day work" determination—(i.e., the number of hours of medically suitable and necessary work identified by the Service is less than the number of hours the employee is permitted to work;[e] or <br><br> -a "complete day no work" determination—(i.e., the Service could not identify any necessary work within the employee's craft, tour, and facility, and within his or her medical restrictions).[e] |

Source: GAO analysis of Service data.

1-2

GAO-10-78  U.S. Postal Service

reevaluation. The future process will be referred to as the "National Assessment Process," according to senior headquarters officials.

## Some Employee Outcomes Vary, Depending on Phase

According to Service officials, during any phase of the NRP, employees may return to full duty (i.e., return to their preinjury job), retire, or resign from the Service. In addition, assuming that necessary and medically suitable work exists, the outcomes for employees in Phases 2 and 3 are the same—employees may continue working in either a new, medically suitable assignment, or in their prior modified assignment.[20] Employee outcomes vary between these phases, however, when sufficient necessary and medically suitable work is not available for the employees to perform. For example, when work is not available, the Service provides employees in Phase 2 (those who have reached their MMI) with an NWA determination and sends them home, along with the necessary forms for filing a wage loss claim to receive compensation from DOL's OWCP for the number of hours they could not work for the Service.[21] In contrast, in Phase 3, when sufficient necessary and medically suitable work is not available, the Service provides employees who have not reached their MMI with either a (1) "partial day work" determination or a (2) "complete day no work" determination. These employees also are referred to DOL's OWCP for wage loss compensation.[22] Figure 3 illustrates the various NRP outcomes experienced by employees in modified work assignments, depending on the employees' MMI status.

---

[20]In Phase 3, such an employee outcome is referred to as a "full day work" determination.

[21]In certain cases, DOL may decide that an individual is eligible not only to receive wage loss compensation but also to participate in its vocational rehabilitation training program.

[22]Wage loss compensation for these employees includes compensation for (1) the number of hours the employees could not work for the Service because of their medical restrictions and (2) the additional work hours for which the Service did not have medically suitable and necessary work for the employees to perform.

1-3

each employee's commuting area. If still unsuccessful, the Service must (for these employees) expand its job search to other facilities beyond the boundary of each employee's current district.[29]

According to senior headquarters officials, the time and resources required to correctly and consistently implement the NRP are necessary to ensure that each employee's job restoration rights are fully protected. These officials also noted that the rigorous process is needed because the NRP can affect whether an employee retains a postal job. They further explained that the methodical nature of the NRP process

- helps ensure that the Service complies with all applicable laws, regulations, and contractual obligations related to employees with workplace injuries, and

- decreases the likelihood of successful grievances, appeals, and other actions against the Service.[30]

Senior headquarters officials told us that in 2006 they initially expected that all phases of the NRP would be completed by January 2010. The NRP's implementation, however, has taken longer than anticipated. Thus, as of August 2009, these officials estimated that the entire process would be completed by September 30, 2010. However, without specific milestones and clear upper management support across the Service's areas and districts, it is unclear when the NRP will be completed.

---

[29]The majority of the job search process is the same for employees who have reached their MMI regardless of when (i.e., more than 1 year, or less than 1 year, after their date of eligibility for compensation). However, for employees who reached their MMI in more than 1 year, postal managers do not need to expand their search for jobs beyond the district's boundaries.

[30]As of July 2009, three of the four largest postal unions had filed a total of six national-level grievances related to the NRP process. The grievances cover a broad scope of issues, ranging from the consideration of seniority when making job offers under the NRP to a challenge of an entire phase of the NRP process. As of July 2009, one grievance had been settled, while the others were either pending a decision by the Service or pending arbitration. On the local level, employees have filed a number of grievances under their union contracts related to their NRP work determinations. In addition to filing grievances, employees have other avenues of redress, including filing actions before the Merit Systems Protection Board and before the Equal Employment Opportunity Commission. Generally, the board adjudicates individual federal employee appeals when an employee believes he or she has suffered an adverse personnel action. The commission adjudicates matters in which the federal employee believes he or she has suffered an action in violation of workplace discrimination laws.

*1-4*

- reassignment to a new medically suitable and necessary work assignment, or an

- NWA determination (i.e., the Service could not find necessary and medically suitable work for employees to perform).

Although the Service tracks and aggregates data on some NRP employee outcomes, it does not track or aggregate data on others. According to senior headquarters officials, they do not track or aggregate data on all employee outcomes because the data are employee-specific and recorded and stored at each of its districts. They explained that aggregating data for the thousands of employees nationwide is challenging, given limited staff resources, the scope of an effort required, and the absence of an automated system for tracking and reporting information on the status of employees in modified work assignments. While senior headquarters officials were able to provide data on employee outcomes for 616 of 1,738 (about 35 percent) employees that were reviewed in the eight districts that had completed, or nearly completed, Phase 2 as of June 30, 2009,[33] they were unable to provide similar data for the remaining 1,122 employees (about 65 percent). Senior headquarters officials told us that data on these employee outcomes were unavailable principally because the Service does not track or aggregate the number of employees who

- remained in their prior work assignment because the Service determined through the employees' NRP review that the work assignment was medically suitable and necessary work, or

- received a new modified work assignment because their prior assignment was determined to be either medically unsuitable or unnecessary to the Service's mission.[34]

According to senior headquarters officials, the Service does not need to track or aggregate these outcomes because both outcomes indicate that the goal of the NRP has been achieved. In its comments on a draft of this

[33]The Service provided us with data on Phase 2 employee outcomes for eight districts as of June 30, 2009. Six of these districts—Western New York, Dakotas, New Hampshire-Vermont, Westchester, Metro Caribbean, and Honolulu—had completed Phase 2, while the 2 others—San Diego and Boston—had essentially completed this phase at that time. The Service was unable to provide us with data for these districts as of August 31, 2009.

[34]In addition, senior headquarters officials do not track or aggregate data on employees with outcomes that have not been resolved because of grievances or appeals.

1~5

report, the Service said that it intends to deploy a new national claims management program in February 2010 that will enhance its ability to track and measure NRP progress and enable cost efficient aggregation of NRP data. However, the Service did not indicate that it planned to use the new program to track and measure NRP employee outcomes.

For the remaining 616 employees (of 1,738) whose specific outcomes headquarters tracked data indicate that

- 103 employees returned to full duty,

- 223 employees retired,

- 257 employees received NWA determinations, and

- 33 employees had "other" outcomes.[35]

Senior headquarters officials also provided us with preliminary data on some employee outcomes for the districts implementing Phase 3 as of August 31, 2009. Most of these data were very limited because the majority of the districts were in the early stages of implementing Phase 3 and, thus, had very few employee outcomes to report. Available data were most complete for the four districts that piloted Phase 3 and, consequently, had been implementing Phase 3 the longest. Outcomes for the 2,301 employees reviewed in these four districts indicated that

- 1,039 employees received a "full day work" determination (about 45 percent),

- 589 employees received a "partial day work" determination (about 26 percent), and

- 673 employees received a "complete day no work" determination (about 29 percent).

While these data provide some useful insights into the districts' early experience with implementing Phase 3, outcomes in this phase are

---

[35]According to senior headquarter officials, "other" outcomes include, but are not limited to, employees who had (1) either been terminated or transferred, (2) their MMI status rescinded by their treating physician, or (3) received a new medical assessment from their physician stating that they were now totally disabled and unable to work for the Service.

*1-6*

nor its total net savings. For example, the protocols used to estimate the Service's savings from Phases 1 and 2

- do not account for savings accruing from all of the possible NRP employee outcomes. For example, although the protocols account for savings accruing for three of the Phase 2 employee outcomes—return to full duty, retirement, and resignation—the Service does not account for savings that, in some cases, might accrue from NWA determinations.[43]

- use "benchmark" cost savings, such as the Service's "lowest fully loaded work hour" for employees—regardless of their actual salaries—to quantify savings associated with the employee outcomes.[44]

- do not account for savings from employee outcomes that accrue beyond 12 months after the outcome occurred. For example, when an employee retires as a result of the NRP, the Service only counts the savings that accrue for the first 12 months after the date of retirement.

- do not offset costs, such as the additional OWCP expenses that accrue from Phase 2 NWA determinations, and do not offset increases in the Service's operational costs resulting from the NRP's implementation.

Because the goal of the NRP is to ensure that all employees with workplace injuries in modified work assignments are performing medically suitable and necessary work—not to produce cost savings—senior headquarters officials told us that they intentionally designed the protocols to arrive at rough estimates that understate the NRP's savings. In addition, they told us that it was not feasible to precisely estimate savings resulting from the NRP because the savings are specific to each employee's circumstances. Furthermore, they said that implementing a more rigorous process for more precisely estimating NRP savings would place unreasonable and unnecessary demands on available staff. Thus, in their view, their current estimating approach is adequate for the Service's needs.

---

[43]For example, as discussed, if an employee receives an NWA determination and is successful in obtaining a new job with a salary that is equal to or greater than the salary he or she received from the Service, the Service no longer incurs any OWCP costs for this employee.

[44]The "lowest fully-loaded work hour" represents the salary and benefits, such as annual leave and retirement, that the Service pays to employees in its lowest clerk position. According to senior headquarters officials responsible for implementing the NRP, this position is a "Clerk 4."

/-7

eliminated data fields that were not relevant to our review, such as information about the employees' pay locations.

We then analyzed the data to determine the number of unique employees contained in the Service's workbooks.[5] In total, there were 59,824 unique employees at the start of our analysis. The majority of these employees (51,516 of 59,824 or, about 86 percent) had only one line of data, or "record," in the workbooks. However, the remaining 8,308 employees had more than one record during fiscal 2008.[6] To ascertain the correct employee record to use in these cases, we devised a protocol for deleting all but the most recent of the employees' records.[7] Thus, at the completion of this activity, we had one record for each of these 8,308 employees.

To determine which of the 59,824 employees occupied a modified work assignment during fiscal year 2008, we ran a frequency analysis on the employees' work status data. In total 50,031 of the 59,824 employees were coded "1," meaning that they were in a modified assignment at some point during fiscal year 2008. The remaining 9,793 employees, however, had a variety of other work status codes, including 53 that we eliminated because data irregularities precluded us from determining anything about the employees' work status. This left us with 9,740 employees with data indicating that the employees had occupied a modified work assignment at some point in the past, but, for example, subsequently had retired or otherwise separated from the Service. Thus, sufficient data were not available for us to determine whether these employees actually occupied a modified work assignment during fiscal year 2008. However, based on our knowledge of the Service's data, and our discussions with senior headquarters officials, we determined that each of these 9,740 employees could have occupied a modified work assignment during fiscal year 2008. We shared our findings with senior headquarters officials who indicated that the results of our analysis were reasonable.

[5]To ensure that employees in these assignments were counted only once in our analysis, we generally used the employees' Social Security numbers as their unique identifier. However, five of the districts' workbooks did not provide the employees' Social Security numbers, so we created other, unique identifiers for these employees.

[6]Multiple records occur when, for example, an employee reaches his or her maximum medical improvement and is moved from a limited duty assignment to a rehabilitation assignment. The 8,308 employees had from 2 to 10 records. Determining why these employees had up to 10 records was beyond the scope of this review.

[7]This protocol was approved by senior Service headquarters officials with overall responsibility for the workbooks and for implementing the NRP.

$I \cdot 8$

# Appendix III: Number, Percentage, and Distribution of Modified Work Assignments Nationwide during Fiscal Year 2008

As discussed in the body of this report, our analysis of Service data found wide variability among Service districts nationwide in the number, percentage, and distribution of employees in limited duty and rehabilitation assignments (modified work assignments) during fiscal year 2008. For example, in Dallas, over 12 percent of all employees in the district (1,719 of 14,150) were in a modified work assignment; while in the Metro Caribbean district, fewer than 2 percent occupied one of these assignments during fiscal year 2008.[1] In addition, about 50 percent of the 50,031 employees in modified work assignments during fiscal year 2008 worked in 30 percent of the Service's organizations (24 of 81 organizations, including headquarters).[2] Table 2 shows the number and percentage of employees in modified work assignments nationwide and the distribution of these assignments, by organization, during fiscal year 2008.

**Table 2: Number, Percentage, and Distribution of Service Employees in Modified Work Assignments Nationwide during Fiscal Year 2008**

| Rank | Service organization (district or headquarters) | Number of employees in limited duty assignments | Number of employees in rehabilitation assignments | Total number of employees in modified assignments | Total number— all employees | Percentage of workforce in modified assignments |
|---|---|---|---|---|---|---|
| 1 | Dallas | 792 | 927 | 1,719 | 14,150 | 12.15% |
| 2 | San Francisco | 479 | 684 | 1,163 | 9,651 | 12.05 |
| 3 | Bay Valley | 1,255 | 189 | 1,444 | 12,276 | 11.76 |
| 4 | Detroit | 698 | 253 | 951 | 8,412 | 11.31 |
| 5 | Los Angeles | 1,131 | 181 | 1,312 | 11,932 | 11 |
| 6 | Northern Ohio | 1,096 | 186 | 1,282 | 12,019 | 10.67 |
| 7 | Santa Ana | 720 | 753 | 1,473 | 14,059 | 10.48 |
| 8 | Colorado Wyoming | 671 | 704 | 1,375 | 13,708 | 10.03 |
| 9 | Seattle | 954 | 174 | 1,128 | 11,282 | 10 |
| 10 | Louisiana | 794 | 132 | 926 | 9,413 | 9.84 |

[1]The Service's headquarters organization had the lowest percentage (70 of 11,370 employees or, fewer than 1 percent) of employees in modified work assignments during fiscal year 2008.

[2]As discussed in appendix II, our analysis of Service data indicates that 50,031 employees with workplace injuries occupied a modified work assignment during fiscal year 2008. Up to 9,740 other employees could have been in such an assignment during the same time period. However, for the purpose of this analysis, we limited our analysis to the 50,031 employees who, based on the Service's data, definitely occupied a modified work assignment during this period.

*/ -9*

Appendix III: Number, Percentage, and
Distribution of Modified Work Assignments
Nationwide during Fiscal Year 2008

| Rank | Service organization (district or headquarters) | Number of employees in limited duty assignments | Number of employees in rehabilitation assignments | Total number of employees in modified assignments | Total number—all employees | Percentage of workforce in modified assignments |
|------|------|------|------|------|------|------|
| 11 | Atlanta | 1,245 | 166 | 1,411 | 14,502 | 9.73 |
| 12 | Pittsburgh | 508 | 127 | 635 | 6,737 | 9.43 |
| 13 | Cincinnati | 740 | 289 | 1,029 | 10,953 | 9.39 |
| 14 | Sacramento | 549 | 430 | 979 | 10,863 | 9.01 |
| 15 | Southeast Michigan | 567 | 79 | 646 | 7,271 | 8.88 |
| 16 | San Diego | 496 | 495 | 991 | 11,262 | 8.8 |
| 17 | South Florida | 534 | 319 | 853 | 9,832 | 8.68 |
| 18 | Sierra Coastal | 365 | 531 | 896 | 10,332 | 8.67 |
| 19 | Ft. Worth | 363 | 371 | 734 | 8,540 | 8.59 |
| 20 | Chicago | 571 | 178 | 749 | 9,315 | 8.04 |
| 21 | Columbus | 440 | 87 | 527 | 6,719 | 7.84 |
| 22 | Houston | 840 | 170 | 1,010 | 13,010 | 7.76 |
| 23 | Alaska | 118 | 25 | 143 | 1,867 | 7.66 |
| 24 | Suncoast | 585 | 324 | 909 | 11,914 | 7.63 |
| 25 | Oklahoma | 275 | 328 | 603 | 8,053 | 7.49 |
| 26 | Lakeland | 702 | 253 | 955 | 12,923 | 7.39 |
| 27 | Northern Illinois | 387 | 392 | 779 | 10,729 | 7.26 |
| 28 | Philadelphia | 722 | 140 | 862 | 11,926 | 7.23 |
| 29 | Northern Virginia | 302 | 157 | 459 | 6,457 | 7.11 |
| 30 | Portland | 578 | 40 | 618 | 8,803 | 7.02 |
| 31 | S.E. New England | 337 | 139 | 476 | 6,896 | 6.9 |
| 32 | North Florida | 351 | 295 | 646 | 9,531 | 6.78 |
| 33 | Capital District | 423 | 188 | 611 | 9,347 | 6.54 |
| 34 | N. New Jersey | 580 | 213 | 793 | 12,132 | 6.54 |
| 35 | Greater Indiana | 557 | 286 | 843 | 13,161 | 6.41 |
| 36 | Salt Lake City | 185 | 92 | 277 | 4,332 | 6.39 |
| 37 | Central Illinois | 719 | 50 | 769 | 12,444 | 6.18 |
| 38 | Big Sky | 106 | 55 | 161 | 2,614 | 6.16 |
| 39 | Triboro | 476 | 150 | 626 | 10,217 | 6.13 |
| 40 | Central Pennsylvania | 651 | 51 | 702 | 11,536 | 6.09 |
| 41 | Connecticut | 433 | 180 | 613 | 10,082 | 6.08 |
| 42 | Erie | 241 | 23 | 264 | 4,353 | 6.06 |
| 43 | Arizona | 500 | 176 | 676 | 11,265 | 6 |
| 44 | Long Island | 450 | 44 | 494 | 8,333 | 5.93 |
| 45 | Massachusetts | 339 | 249 | 588 | 9,989 | 5.89 |

*1~10*

GAO-10-78 U.S. Postal Service

Appendix III: Number, Percentage, and
Distribution of Modified Work Assignments
Nationwide during Fiscal Year 2008

| Rank | Service organization (district or headquarters) | Number of employees in limited duty assignments | Number of employees in rehabilitation assignments | Total number of employees in modified assignments | Total number—all employees | Percentage of workforce in modified assignments |
|------|--------------------------------------------------|--------------------------------------------------|----------------------------------------------------|----------------------------------------------------|-----------------------------|-------------------------------------------------|
| 46 | Gateway | 504 | 239 | 743 | 12,679 | 5.86 |
| 47 | Nevada Sierra | 275 | 30 | 305 | 5,216 | 5.85 |
| 48 | Rio Grande | 677 | 85 | 762 | 13,084 | 5.82 |
| 49 | Greensboro | 559 | 69 | 628 | 10,880 | 5.77 |
| 50 | South Jersey | 253 | 143 | 396 | 7,027 | 5.64 |
| 51 | Central New Jersey | 288 | 125 | 413 | 7,494 | 5.51 |
| 52 | Honolulu | 101 | 55 | 156 | 2,836 | 5.5 |
| 53 | Boston | 176 | 169 | 345 | 6,506 | 5.3 |
| 54 | New Hampshire - Vermont | 224 | 91 | 315 | 6,024 | 5.23 |
| 55 | Baltimore | 274 | 182 | 456 | 9,044 | 5.04 |
| 56 | Greater Michigan | 375 | 113 | 488 | 9,727 | 5.02 |
| 57 | Mid-Carolinas | 427 | 60 | 487 | 9,796 | 4.97 |
| 58 | Appalachian | 315 | 47 | 362 | 7,400 | 4.89 |
| 59 | Richmond | 238 | 204 | 442 | 9,064 | 4.88 |
| 60 | Tennessee | 571 | 124 | 695 | 14,578 | 4.77 |
| 61 | Albuquerque | 74 | 111 | 185 | 3,884 | 4.76 |
| 62 | Western New York | 291 | 69 | 360 | 7,747 | 4.65 |
| 63 | Central Florida | 342 | 121 | 463 | 9,974 | 4.64 |
| 64 | Hawkeye | 249 | 166 | 415 | 9,120 | 4.55 |
| 65 | South Georgia | 179 | 104 | 283 | 6,365 | 4.45 |
| 66 | Maine | 93 | 84 | 177 | 4,067 | 4.35 |
| 67 | Greater S.Carolina | 212 | 83 | 295 | 7,283 | 4.05 |
| 68 | Arkansas | 222 | 38 | 260 | 6,427 | 4.05 |
| 69 | Mid-America | 259 | 173 | 432 | 11,044 | 3.91 |
| 70 | Alabama | 212 | 171 | 383 | 9,857 | 3.89 |
| 71 | Albany | 151 | 150 | 301 | 7,813 | 3.85 |
| 72 | Spokane | 139 | 45 | 184 | 5,022 | 3.66 |
| 73 | Central Plains | 211 | 156 | 367 | 10,338 | 3.55 |
| 74 | Dakotas | 112 | 52 | 164 | 5,134 | 3.19 |
| 75 | New York | 407 | 67 | 474 | 15,146 | 3.13 |
| 76 | Northland | 451 | 31 | 482 | 15,781 | 3.05 |
| 77 | Kentuckiana | 159 | 139 | 298 | 10,034 | 2.97 |
| 78 | Mississippi | 103 | 53 | 156 | 5,576 | 2.8 |
| 79 | Westchester | 73 | 54 | 127 | 6,424 | 1.98 |
| 80 | Metro Caribbean | 27 | 35 | 62 | 3,404 | 1.82 |

GAO-10-78  U.S. Postal Service

Appendix III: Number, Percentage, and
Distribution of Modified Work Assignments
Nationwide during Fiscal Year 2008

| Rank | Service organization (district or headquarters) | Number of employees in limited duty assignments | Number of employees in rehabilitation assignments | Total number of employees in modified assignments | Total number— all employees | Percentage of workforce in modified assignments |
|---|---|---|---|---|---|---|
| 81 | Headquarters | 34 | 36 | 70 | 11,370 | 0.62% |
| **Total** | | **35,082** | **14,949** | **50,031** | **748,307** | 6.68% |

Source: GAO analysis of Service data.

GAO-10-78 U.S. Postal Service

# Appendix IV: Description of NRP Activities, by Phase and Step

Figures 6, 7, and 8 provide additional information about the NRP, including a description of activities, by phase and step.

**Figure 6: Description of NRP Activities in Phase 1**

| Step | Responsible team member | Activity description |
|---|---|---|
| 1 | • District Injury Compensation Specialist | Identify all employees in modified work assignments |
| 2 | • Area National Assessment Process Injury Compensation Specialist | Transfer information about these employees to the NRP workbook |
| 3 | • Area Injury Compensation Manager<br>• Area Medical Function Representative<br>• Area Operations Team Leader | Brief senior district management on NRP Phase 1 |
| 4 | • District injury compensation staff | Identify employees in modified work assignments who require medical review |
| 5 | • District medical staff<br>• District injury compensation staff | Review all employees identified in step 4; determine if medical updates are required |
| 6 | • District medical staff<br>• District injury compensation staff<br>• District labor relations staff | Follow up on employee medical update requests |
| 7 | • District Assessment Team (DAT) including operations, injury compensation and medical staffs | DAT verifies current job offer matches tasks performed |
| 8 | • District medical staff<br>• District labor relations staff | Ensure procedures for light duty assignments are in effect, enabling identification and tracking of these employees[a] |
| 9 | • District medical staff | Identify veterans-preference eligible employees in light duty assignments |
| 10 | • District Injury Compensation Specialist or staff | Update NRP workbook to ensure all veterans in modified work assignments are properly recorded |
| 11 | • District Injury Compensation Specialist or staff | Create NRP file for all employees in modified work assignments to ensure that all necessary documents are on file |
| 12 | • Area injury compensation team | Review injury compensation file and NRP file for employees in all modified work assignments to verify that the NRP file is complete and accurate in preparation for reassessing employees |
| 13 | • Area Injury Compensation Manager | Area injury compensation staff review NRP Phase 1 actions – all aspects must be verified as accurately completed |

Source: GAO analysis of Service data.

[a]In some cases, the Service also provides modified work assignments to employees injured off-the-job. These assignments are called "light duty" assignments. However, they are beyond the scope of our review.

1-13

GAO-10-78 U.S. Postal Service

Appendix IV: Description of NRP Activities,
by Phase and Step

## Figure 7: Description of NRP Activities in Phase 2

| | | Phase 2[a] |
|---|---|---|
| **Step** | **Responsible team member** | **Activity description** |
| 1 | • Headquarters Injury Compensation Team Leader | Train area and district NRP teams on Phase 2 search process |
| 2 | • Area NRP team | Introduce and initiate NRP Phase 2 with district senior staff |
| 3 | • District senior management<br>• Area and district injury compensation team leaders<br>• Area and district operations team leaders<br>• Area and district labor relations managers | Hold meeting with all applicable union representatives |
| 4 | • Area injury compensation team<br>• District injury compensation staff | Update NRP workbooks to include all employees who have reached their maximum medical improvement (MMI), i.e., employees in rehabilitation assignments, and employees who have not reached their MMI, i.e., employees in limited duty assignments |
| 5 | • Area NRP team | Meet with district NRP team to discuss "necessary work" assignments |
| 6 | • Area and district NRP teams | Prepare local commuting area documentation for employees who have reached their MMI |
| 7 | • Area NRP team | Perform job searches for all employees who reached their MMI in less than a year to identify potential rehabilitation assignments within their local commuting area |
| 8 | • Area and district NRP teams | Perform job searches for all employees who reached their MMI in more than a year to identify potential rehabilitation assignments within their local commuting area |
| 9 | • Area and district NRP teams | Meet to discuss the status of all employees who have reached their MMI |
| 1 | • District Injury Compensation Manager<br>• District operations team | District operations team submits the DAT-approved proposed job offers (i.e., rehabilitation duties worksheets) to the senior manager for approval, thus demonstrating that the position had been identified and approved by senior management. |
| 2 | • District injury compensation staff<br>• District operations team leaders | Prepare and complete formal job offers |
| 3 | • District NRP team (operations and injury compensation)<br>• District labor relations team | Schedule employee interviews to discuss and present job offers; notify employees and union representatives |
| 4 | • District NRP team | Conduct interviews for the approved job offers with employees |
| 5 | • District NRP team<br>• District Injury Compensation Manager<br>• District NRP Labor Relations Representative | Two weeks after each interview, follow up to ensure that each employee has responded to their job offer |
| 6 | • District Injury Compensation Manager | When the job offer is accepted, the Injury Compensation Manager must coordinate with the manager of the new facility to prepare for the employee to start work there |
| 1 | • Area Injury Compensation Manager<br>• Area Injury Compensation Team Leader | Meet with DOL's OWCP District Director to discuss the NRP and the Service's preliminary NWA list |
| 2 | • Area and district NRP teams | Area and district teams review all NWA employee files and review them for accuracy |
| 3 | • Area and district NRP team leaders | Meet with district managers on the status of the NRP and discuss the job searches that senior managers will have to approve |
| 4 | • Area NRP team leaders | Brief surrounding district managers in the local commuting area on the NRP, and discuss the district's responsibility in completing the job searches |
| 5 | • District injury compensation staff<br>• District NRP operations team | Track and file job search results |
| 6 | • District NRP team | Schedule interviews with employees receiving NWA determinations |
| 7 | • Area NRP team | Brief the Service's Inspection Service and its Office of Inspector General on NRP and NWA interviews[b] |
| 8 | • Area NRP team<br>• District labor relations team<br>• District Operations Team Leader | Brief local unions about ongoing and preliminary NWA employee results |
| 9 | • District NRP team | Prepare employee resource guide and meet with applicable Service staff to discuss the final steps of the NWA process |
| 10 | • District NRP team | Notify employees by letter at least 14 days in advance of employee interviews |
| 11 | • Area NRP team | Brief district NRP teams on the prescribed script for the interviews and select interview team leaders |
| 12 | • District NRP team<br>• Area Operations Team Leader<br>• Area Injury Compensation Team Leader | Conduct first interviews with all affected employees |
| 13 | • District NRP Operations Team Leader or member | Notify facility managers of upcoming second interview with employees receiving NWA determinations |
| 14 | • District NRP team<br>• Area Operations Team Leader<br>• Area Injury Compensation Team Leader | Conduct second interviews with employees receiving NWA determinations |
| 15 | • District injury compensation staff<br>• District NRP operations team | Track and identify activities related to employees placed on OWCP's rolls due to NWA determinations |

Source: GAO analysis of Service data.

[a]The Service calls this phase, "Phase 2: Rehabilitation." To enhance the clarity of this report, we refer to this phase as "Phase 2."

*1-14*

GAO-10-78 U.S. Postal Service

Appendix IV: Description of NRP Activities,
by Phase and Step

[a]The Service notifies representatives within its Postal Inspection Service and its Office of Inspector
General in anticipation of problems that may be encountered during interviews with employees
receiving an NWA determination.

**Figure 8: Description of NRP Activities in Phase 3**

| | Phase 3[a] | |
|---|---|---|
| Step | Responsible team member | Activity description |
| 1 | • Headquarters Health and Resource Management Team Leader | Meet with area and selected district NRP team members and train them on this phase |
| 2 | • Headquarters NRP team<br>• Area NRP team | Meet with district senior managers to initiate this phase and confirm their support |
| 3 | • District senior management | Meet with union representatives and Service management organizations to inform them about this phase |
| 4 | • Area Health and Resource Management Team Leader<br>• District health and resource management staff | Review NRP workbook files to ensure that all employees who have not yet reached their MMI are listed |
| 5 | • Area NRP team<br>• District NRP team | Train district managers on their role in Phase 3 |
| 6 | • Area NRP team<br>• District NRP team | DAT conducts initial modified work assignment determinations and area team commences its review of these determinations |
| 1 | • Headquarters/area/district NRP teams | Review all proposed modified work assignment determinations for accuracy |
| 2 | • Headquarters/area/district NRP teams | Train facility managers or supervisors on work status meetings and explain all possible work status determinations |
| 3 | • DAT | Review documentation for all modified work assignments for compliance |
| 4 | • Facility Manager/Supervisor | On a daily basis, review available necessary tasks and make assignment determinations, and conduct daily work status meetings with injured employees who have not yet reached their MMI |
| 1 | • Facility Manager/Supervisor | Employee presents updated medical documentation for an existing injury or new documentation for a recent injury |
| 2 | • Facility Manager/Supervisor | Managers/supervisors assess each employee based on recently presented medical documentation to determine the availability of necessary work |
| 3 | • Facility Manager/Supervisor | Managers/supervisors present work status determination to each employee, elicit employee feedback regarding the proposed assignment, and make adjustments if necessary |

Source: GAO analysis of Service data.

[a]The Service calls this phase, "Phase 2: Limited Duty." We refer to this phase as "Phase 3."

*I-15*

To Whom It May Concern:

My name is Chuck Lee. I work at the PMA (Priority Mail Annex) on Tour 2 as Mail Processing Clerk and Clerk Union Steward on Day Shift. On February 8th, 2011 – around 9:45am, my supervisor Donna Gruetzmacher called me to see the gentleman stand by her desk. He introduced me as U.S. Postal Inspector Michel Vanchek to discuss about to interview one of the mechanic (Brenda Burke). At the mean time, U.S. Postal Inspector Michel Vanchek provided his business card to my supervisor Donna Gruetzmacher. Then I requested his business card but he denied my request. At 10am, I called my APWU Local President Jessie Gobunquin how to handle this issue. Mr. Gobunquin gave me his direction not to represent because of difference crafts. On the same tour, Mr. Lance M. to represent for Ms. Burke was available.

Regards,

Chuck Lee
Tour 2 PMA  Clerk Union Steward
02/22/2011

2

# 2 Audits and Investigations

## 21 General

### 211 Authority

#### 211.1 Responsibility

##### 211.11 Inspector General

The Office of Inspector General (OIG), authorized by law in 1996 as a federal law enforcement and oversight agency, conducts audits and investigations of Postal Service programs and operations, and oversight of the Postal Inspection Service (5 United States Code [U.S.C.] App. 3; 18 U.S.C. 3061; and 39 U.S.C. 404 (a)(7)). The OIG is headed by the inspector general. The inspector general, independent of postal management, is appointed by and reports directly to the nine presidentially appointed Governors of the Postal Service (39 U.S.C. 202).

##### 211.12 Chief Inspector

The Postal Inspection Service, a federal law enforcement agency, conducts audits and investigations of Postal Service programs and operations (18 U.S.C. 3061 and 39 U.S.C. 404 (a)(7)), and is headed by the chief inspector, who reports directly to the postmaster general. The chief inspector acts as security officer and emergency coordinator for the Postal Service and maintains liaison with other investigative and law enforcement agencies of the government, as well as the Federal Emergency Management Agency and other emergency coordinators.

##### 211.13 Designation of Functions

The Governors approved a distribution of duties and responsibilities between the OIG and the Postal Inspection Service to maximize each organization's capabilities and maintain their legislated roles and responsibilities. The designations of functions provide for partnering opportunities, while avoiding duplicative efforts. See Exhibit 211 for a synopsis of the designation of functions.

3 -1

Contents

211.13                                               Administrative Support Manual

Exhibit 211
**Designation of Functions**

| Office of Inspector General* | Postal Inspection Service |
|---|---|
| **Audits** | |
| ■ Financial statements, including:<br>  – Overall opinion audits<br>  – Quality reviews of Postal Inspection Service work | ■ Financial statements, including installations and districts |
| ■ Postal-wide performance reviews | ■ Area, district and local performance reviews |
| | ■ Service investigations |
| ■ Contract audits, except pre-award and post-award audits | ■ Pre-award and post-award contract audits |
| ■ Developmental audits | |
| ■ Facility audits, including:<br>  – Facilities construction contracts of $10 million or more<br>  – Right of first choice on contracts valued between $5–10 million<br>  – Leases of $1 million or more<br>  – Repair and alterations of $1 million or more | ■ Facility audits, including:<br>  – Facilities construction contracts of $5 million or less<br>  – Contracts between $5–10 million not performed by OIG<br>  – Leases under $1 million<br>  – Repair and alterations under $1 million |
| ■ Revenue-focused audits (international mail) | |
| **Investigations** | |
| ■ Revenue cases, including:<br>  – Bribery, kickbacks, conflicts of interest<br>  – Systemic reviews | ■ Revenue cases, including:<br>  – Revenue loss detection<br>  – Shares with OIG on revenue task force and other groups |
| ■ Workers' compensation cases, including:<br>  – Inspector General subpoenas<br>  – Program monitoring | ■ Primary responsibility for workers' compensation cases |
| ■ Tort claims, including:<br>  – Serious incidents<br>  – Liability reports | ■ Tort claims |
| ■ Embezzlements (conduct/partner on cases of $100,000 or more) | ■ Embezzlements under $100,000 |
| ■ Expenditure cases, including:<br>  – Bribery, kickbacks, and conflicts of interest<br>  – Systemic reviews | ■ Expenditure cases, including:<br>  – Cases referred by OIG<br>  – IMPAC card cases<br>  – Local purchases or procurements |
| ■ Conduct/partner on cases involving executives | ■ Emergency responses on cases involving executives |
| | ■ Internal and external crimes |
| | ■ Employee protection |
| | ■ Security |
| | ■ Fraud and prohibited mailings |
| ■ Postal Inspection Service internal affairs: executives | ■ Postal Inspection Service internal affairs: non-executives |
| ■ Computer forensics | ■ Forensic and technical services |
| ■ Hotline | |
| **Other** | |
| **Additional OIG work:**<br>■ Oversight of the Postal Inspection Service<br>■ Postal rate-making programs and operations<br>■ Revenue generation<br>■ Labor management<br>■ Electronic commerce | |

---

* The Inspector General has oversight responsibility for Postal Inspection Service functions. The Inspector General retains the right to conduct/partner with the Postal Inspection Service on audits and investigations, pursuant to the Inspector General Act.

3-2

Contents

211.14   **Federal Laws and Postal Regulations**

211.141   The OIG is responsible for promoting economy, efficiency, and effectiveness, and preventing and detecting fraud, waste, and abuse in all postal programs and operations. The OIG conducts and supervises audits, evaluations, and investigations and keeps the Governors and Congress fully informed of problems and deficiencies and the progress of corrective actions. Under applicable policies, regulations, and procedures, it carries out investigations and presents evidence to the Department of Justice and U.S. attorneys in investigations of a criminal nature.

211.142   The Postal Inspection Service is responsible for protection of the mails, enforcement of federal laws and postal regulations within its jurisdiction as provided in 211.22, plant and personnel security, and coordinating Postal Service emergency preparedness planning of both a wartime and a natural disaster nature. The Postal Inspection Service, under applicable policies, regulations, and procedures, carries out investigations and presents evidence to the Department of Justice and U.S. attorneys in investigations of a criminal nature. In coordination with the OIG, the Postal Inspection Service also performs selected audits and reviews of the Postal Service.

211.2   **Arrest and Subpoena Powers**

211.21   **Authorization**

OIG special agents and postal inspectors are authorized to perform the following functions in connection with any matter within their respective official duties as established by the inspector general and the chief inspector:

a.   Carry firearms.

b.   Serve warrants and subpoenas issued under the authority of the United States.

c.   Make arrests without warrant for offenses against the United States committed in their presence.

d.   Make arrests without warrant for felonies cognizable under the laws of the United States, if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.

211.22   **Limitations**

The powers granted by 211.21 are exercised only in the enforcement of laws regarding property in the custody of the Postal Service, property of the Postal Service, the use of the mails, other postal offenses, and pursuant to any agreements between the attorney general and the Postal Service, in the enforcement of other federal laws, violations of which the attorney general determines have a detrimental effect on the Postal Service.

3-3

Contents

## 211.3  Access to Records

### 211.31  Records and Documents

The OIG and Postal Inspection Service are authorized access to all records and documents of possible relevance to an official audit, evaluation, fact-finding, inspection, investigation, review or other inquiry whether they are in the custody of the Postal Service or otherwise available to the Postal Service by law, contract, or regulation. This includes information about mail sent or received by a particular customer. Exceptions to authorized access are listed in 211.33.

### 211.32  Disclosure

Information obtained under 211.31 may be disclosed to other postal employees who have a need for such information in the performance of their duties or to any federal, state, or local government agency or unit thereof that needs such information for civil, administrative, or criminal law enforcement. Any such disclosure must be consistent with Postal Service privacy regulations (see Handbook AS-353, *Guide to Privacy and the Freedom of Information Act*).

### 211.33  Exceptions

There are no exceptions when an inquiry, such as an investigation, inspection, evaluation, fact-finding, review, or audit is conducted under the authority of the Inspector General Act. Exceptions to the policy of disclosure are the following:

a.  For information from the covers of mail, see 213. For dead mail, see the *Domestic Mail Manual*.

b.  For access to employee restricted medical records and Employee Assistance Program records, see Handbook EL-806, *Health and Medical Service*, Chapter 2, and *Employee and Labor Relations Manual* (ELM) 870.

c.  For access to an employee's Form 2417, *Confidential Statement of Employment and Financial Interests*, see the ELM or 39 CFR 447.42(e)(2).

## 212  Circulars and Rewards

### 212.1  Wanted Circulars

The Postal Inspection Service and the OIG issues wanted circulars to help locate and arrest fugitive postal offenders. Post these circulars in the most conspicuous place in the post office lobby and in other prominent places. Post near Poster 296, *Notice of Reward*. Telephone immediately the postal inspector in charge or inspector general with any information on the possible location of the person wanted. Remove and destroy circulars immediately when notified of their cancellation or when the circular is not listed in the periodic *Postal Bulletin* notices of current wanted circulars.

3-4



Area CSPAs and Field Support & Integration Telecon
*Meeting Minutes*
March 7, 2007,



| Meeting Type | Monthly Telecom |
|---|---|
| Facilitator | Rainy Smith |
| Date / Time | 03/07/07, |
| Location | Telecom |
| Attendees | Duquesa Wright, Grace David, Sue Shields, Gayla Gorman, Bill Halstead, Joe Lacko, Bill Zapor, Pam Brown & Terry Graves, Mike Rodriguez (for R. Bullock), Carol Larson, Robert Farug, |
| Minutes | Lucy Brown, |

## 1.   MINUTES

**Meeting Overview**
Kelvin Mack, Manager, In-Sourcing Program, will provide an overview of this call center initiative and the Customer Care Center pilot activities occurring in the Detroit District. Field Support & Integration and Area updates.

**In-Sourcing Program - Kelvin Mack**
The Corporate Contact Center contract currently costs the USPS $65 million annually. With an ever expanding variety of customer call types, EMRS (Express Mail), Claims and now Inspection Service calls, contract costs will increase and could increase to $82 million annually. Twenty-two to thirty-three million calls are handled by agents and forty-three million calls are handled by the IVR a year.

The purpose of the In-Sourcing program is to bring call center operations back in-house using rehab and limited duty employees already on rolls (about 32,000 nationally). This is one of many projects being developed to improve the effectiveness and operational efficiency of responding to customer's inquiries and concerns.

The Detroit District has been selected as the pilot Customer Care Center with Consumer Affairs Manager, Glenda Herrmann selected as the manager. Management staff includes three supervisors. Headquarters purchased equipment and the district is absorbing the work hours. The pilot will continue until June 2008.

The Detroit center will handle ZIP codes & domestic rate calls initially. Using the same 800-ASK-USPS phone number customers requesting ZIP Code and rate information will automatically be transferred to the Detroit Customer Care Center. Twenty five agents started this week; total of eighty-five agents needed. Hours of operation are M-F 8am-8:30pm, and Sat 8am-4:30pm. Success target - $800,000 earned by handling calls diverted from Convergys. Call duration goal - 3 minutes initially; will reduce over time. Calls will be recorded. Future plan is to survey customers to gauge satisfaction.

Future plan – implement program in a district that has large pool of target employees; establish a twenty-four hour operation with 250 positions. Under consideration – process where sales and service associates (SSAs) can call the center and obtain assistance with Spanish speaking customers.

**FSI Update:**
**CAM Orientation**
Carol Larson shared that Ms. Killette asked Field Support to develop an orientation program for new CAMs to be funded by HQ Consumer Affairs. Carol is the lead for this project.

The proposal at this time recommends:
•   1.5 day session at HQ

4-1



**Area CSPAs and Field Support & Integration Telecon**
*Meeting Minutes*
*March 7, 2007*

- The program would be funded only for permanent CAMs. Acting CAMs could attend if travel and per diem were funded by the District.
- Based on varying background of new CAMs, the program needs to be flexible to include training specific to CAM knowledge base. CAMs will be asked to complete a survey on their perceived competency/skill levels before the orientation session.
- Goal is to schedule first session in early April.
- Input has been obtained from several new CAMs, "seasoned" CAMs, CSPAs and HQ Consumer Affairs functional groups on what information should be presented as part of CAM orientation.

**PARS Web Conference**
Carol Larson shared that Field Support has been asked to present a Web Conference on PARS. We would be glad to accommodate but need a more defined focus. CSPAs were asked to query their CAMs on what they would find helpful to be addressed. We need specific topics, i.e. how to troubleshoot when . . . ; problems created due to failure to follow correct processes, etc. CSPAs are asked to send CAM feedback to CRM Support by COB March 16. Also, are there any CAMs in your Area who have more experience with PARS and would offer to help present on a Web Conference.

**FY07 Rate Case**
In preparation for the rate changes, Core Language references to rates are being updated. Publish date for the Postal Bulletin Special Rates Issue is April 6, 2007. *Note: This is an update of the date provided on the telecom.* The Liberty Bell Forever stamp will be on the cover. The Bulletin will contain Summary of Changes by class, field implementation kit, self service section, list of support materials being shipped, Stand-up talks, FAQs, Fact Sheets, etc. Retail Operations is developing two hour course for the customer service employees. Recommendation is the course should be conducted via classroom setting.

**CAWeb and Directory Updates**
To increase CSPA convenience when updating the Area/District directories on the CAWeb site, a link to the Data Manager (HRIS) page has been added, see *CAM Directory Updates (for CSPA use only).*

CSPAs are encouraged to regularly update current staff information for all managers within their respective areas/districts. Page 12 of the CSPA Resource Guide includes instructions for obtaining Data Manager access and updating directory information. Go to CAWeb, then FSI page for link.

**CAWeb and MeetingPlace Resources**
A Public Folder was formerly used to post reference materials associated with Consumer Affairs representatives training sessions. With the establishment of new Information Technology guidelines, we will post FY07 materials on CAWeb under "Training", see http://blue.usps.gov/caweb/training.htm. An announcement will be provided to all once the site has been updated. *Update: site is up as of Wednesday, March 14, 2007.*

**Area Updates:**
WEA – Pam shared that Paul Mitchell was in the area working with CAMs on the Accuracy of Delivery Campaign (ADC) program.
PAC – Grace shared that the San Francisco CAM had recently experienced a series of SIR oddities. CAM is detailing in an email to CRM Support for follow-up.
SEA – Mike expressed the SEA CAMs sentiment that the recent CARE software change restricted the ease of updating cases.
EA – Gayla shared that Gary Brian (CAM in KY) has been promoted and Barbara Gerenser won the Telephone Doctor Best Customer Service Story contest. Gayla requested particulars regarding claims changes that may be occurring in conjunction with rate changes. Rainy will follow-up with department contacts.
CM – Joe advised that the area was doing a redeployment of the ADC program.

| Deleted: September |
| Deleted: October |
| Deleted: 4 |
| Deleted: 6 |
| Deleted: 6 |
| Formatted: Indent: Left: 0.5" |
| Formatted: Font: 10 pt |
| Formatted: Font: 10 pt |
| Formatted: Font: Bold |
| Formatted: No underline, Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: No underline, Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: No underline, Font color: Auto |
| Formatted: Font color: Auto |
| Formatted [...24] |
| Formatted: No underline |
| Formatted: Font color: Auto |
| Formatted [...25] |
| Formatted: Font color: Auto |
| Formatted: Font: Bold |
| Formatted: Bullets and Numbering |
| Formatted: Font: Bold |
| Formatted: Font: Italic |
| Formatted: Font: Not Bold, Italic |
| Deleted: ¶ |
| Deleted: ¶ |
| Deleted: ¶ |
| Deleted: <#>International Cl [...27] |
| Deleted: ¶ [...28] |
| Formatted: Font: Not Bold |
| Formatted: Font: Not Bold |
| Deleted: ¶ |
| Deleted: ¶ [...29] |
| Formatted: Font: Not Bold |
| Deleted: Roland responded [...30] |
| Deleted: ¶ [...31] |
| Deleted: NOTES [...32] |

4-2



**Area CSPAs and Field Support & Integration Telecon**
*Meeting Minutes*
*March 7, 2007*

| Deleted: *September* |
| Deleted: *October* |
| Deleted: *4* |
| Deleted: *6* |
| Deleted: *6* |
| Formatted: Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: Font color: Auto |
| Formatted: Font color: Auto |

GLA – Sue shared that PMG Jack Potter was visiting Chicago next week. Sue shared a factor she witnessed contributing to service issues is the large number of vacant routes in at least one large facility.
NYM – Duquesa shared that the area was focusing on overdue SIRs and contact scores. She also noted that at the recent area marketing manager's meeting, HQ Consumer Affairs was not represented. Carol took this as an action item to discuss with Robert so Consumer Affairs can be included on future agendas.
NEA – Bill shared that International Claims is a persistent problem area. The Inspection Service is conducting a four hour Fraud session that will be attended by 6 of 8 CAMs. Acting VP is sending congratulatory letters to 5 STAR recipients.

A suggestion was made to offer the opportunity for additional Answer Station licenses to be purchased locally so individual CAO clerks could have access. A separate follow-up email will be sent to Area CSPAs for response.

Next telecom: Wednesday, April 4, 1-2 PM.

| Deleted: October |
| Deleted: November 1 |
| Deleted: 4 |

| Deleted: NOTES 080906CLARSON . . . 9/13/2006 . . PAGE 4 . . |

Y-3

# UNITED STATES POSTAL SERVICE
# CONSUMER ADVOCATE

**August 31, 2007**



## VP Consumer Advocate attends grand opening

Detroit Call Center now Detroit Customer Care Center began training to become a national Call Center in February 2007. Training was completed March 5 for the 20 agents and they were expected to handle 3200 calls per day. Those expectations were exceeded when on March 26th the 20 agents took 5000 calls and were asking for more. The employees signing up as agents were limited duty and now work as call center agents. *"Today we are celebrating!"* said VP and Consumer Advocate Delores Killette during the grand opening ceremonies. "We are celebrating a project that's helping Postal employees and the Postal Service stay on the path to success. The new Customer Care Center in Detroit opened for business June 21, 2007.   Roxanne Wenskay, Detroit Marketing Manager, introduced speakers Delores Killette, Vice President Consumer Advocate, Headquarters; JoAnn Feindt, Vice President Area Operations; Nancy Rettinhouse, Detroit District Manager and Sandra Laemmel, NALC Branch 1 President, Detroit. This new national call center is one more way the Postal Service using to make it easier for postal customers to contact the Postal Service and received solutions to problems and answers to questions.

Working together as a team with one common goal management and employees are learning on the job together and building a solid path to success. Congratulations to the Detroit Call Center for their can do attitude working this new concept. For more information contact Glenda Herrmann 313-225-5420.

## eCustomerCare project tested

Headquarters Consumer Affairs is pleased to announce the launch of the Enterprise Customer Care (eCC) Proof of Concept (PoC) in September 2007. The eCC PoC, coordinated by the Corporate Customer Contact group, will test the foundation for a new enterprise solution for Web self-service and USPS case management. This two-pronged approach supports customer service through a more customer intuitive online form for inquiry submission and routing, and streamlines customer service operations with email response capability for internal users.   A special thank you to the Northeast Area and Boston District for their efforts as the test site this project

4-4

District Manager
Seattle District

 **UNITED STATES**
**POSTAL SERVICE.**

October 1, 2007                                    **Permanent Posting**
                                                  **Employee Bulletin Boards**

SUBJECT:                    Reasonable Accommodation
                            Policy Statement

MEMORANDUM FOR:             Postmasters
                            Station and Branch Managers
                            Plant Managers
                            Supervisors
                            Seattle District Staff


In the event that you have an employee that is disabled or becomes disabled due to a physical
or mental condition, he or she may request that accommodations be made in order to perform
their job.  When a request is made, (written request should be obtained), a Reasonable
Accommodation Assessment Form *must* be completed properly and signed by all officials. in
every case without exception.  Managers are required to submit all denied requests for
accommodation (if the condition is permanent) to the District Reasonable Accommodation
Committee (DRAC), for review and assessment, utilizing a Reasonable Accommodation
Nomination.

Attached is an updated Accommodation Assessment Form dated (9/17/03), *other editions should
not be used.*  This assessment form is a tool to assist you in making informed and accurate
decisions in response to requests for reasonable accommodation (a request for a change at work
for a reason related to a medical condition which will impact an essential job function).

The assessment form will also be included as a part of the accident kit provided to all offices.  In
addition to whenever a specific request for reasonable accommodation is made, you are required
to complete the assessment form under the following circumstances:

  ➤ If an employee reports an injury and requests light duty while the claim is being
    adjudicated.
  ➤ If an on-the-job injury claim is denied and the employee requests light duty.
  ➤ If the employee disagrees with the light duty assignment.

Failure to afford an employee or applicant (qualified disabled) appropriate accommodations
when necessary and/or requested, can lead to costly lawsuits.  There are **no** exceptions to the
use of the attached *assessment form*.

For more information refer to Handbook EL-307 (9/2003), Guidelines on Reasonable
Accommodation and/or call the EEO/Dispute Resolution Office at (206) 442-6290, or the Health
Resource Management Office at (206) 442-6040.  Additional resources available to you are
Publication 317 (9/2003), Manager's Guide to Reasonable Accommodation, and Publication 318
(3/00), and Reasonable Accommodation Interactive Process.


Harold J. Matz
District Manager

PO Box 90400
Seattle WA 98109-9997
206-442-6032   FAX 206-442-6006